**DELMARVA POWER & LIGHT CO., and Star Enterprise, Inc., Plaintiffs,**

**v.**

**Christophe A.G. TULOU, Secretary of State of Delaware Department of Natural Resources and Environmental Control, Department of Natural Resources and Environmental Control, and State of Delaware, Defendants.**

C.A. Nos. 98C–02–220 SCD, 98A–04–011 SCD.

Superior Court of Delaware.

Submitted: Nov. 10, 1998.

Decided: Dec. 4, 1998.

---

869

Robert W. Whetzel,and Tara J. Hoffner of Richards, Layton & Finger, Wilmington, for Plaintiffs Delmarva Power & Light Company and Star Enterprises, Inc.

David L. Ormond, Jr. of DNREC Legal Office, Wilmington, for Christophe A.G. Tulou, Secretary, State of Delaware Department of Natural Resources and Environmental Control and Department of Natural Resources and Environmental Control and State of Delaware.

## MEMORANDUM OPINION

DEL PESCO, Judge.

This case concerns the adoption of Regulation No. 37 by the Delaware Department of Natural Resources and Environmental Control ("DNREC" or "the Department"). The plaintiffs contend the regulation was adopted without a reasonable basis on the record. They seek to have the regulation vacated and remanded to the Department.

Although the business of air quality regulation is very complex, there are a number of statutory relationships which must be understood in order to make sense of the arguments of the petitioners. As is so often true, there is also an alphabet soup of terminology which seems to be unavoidable.

In its simplest form, the discussion begins with the Clean Air Act ("CAA").[1] The goal of the CAA is to reduce air pollutants. One method for accomplishing that goal is to empower the Environmental Protection Agency ("EPA") to establish, through a process not pertinent here, national ambient air quality standards

---

1. 42 U.S.C. § 7401, *et seq.* (1994).

("NAAQS"). The NAAQS are the maximum acceptable concentrations of air pollutants, such as ozone, that will protect public health and welfare.[2] The NAAQS for ozone have been established at 0.12 parts per million of ozone, calculated on a 1–hour average basis.[3] Ozone is not emitted directly from emission sources. Instead, it is formed in the lower-atmosphere by the reaction of other substances in sunlight. Pertinent to this discussion is the fact that emissions believed to contribute to ozone are nitrogen oxides ("NOx"). There is some uncertainty in the scientific community as to the role of NOx emissions in the formation of ozone.[4]

Two of Delaware's three counties, New Castle and Kent, fail to meet the NAAQS;[5] those counties are nonattainment areas.[6] That being the case, the State has a strong interest in taking steps to reduce its emissions in order to avoid various sanctions that can be imposed by the federal government in years to come.

Another part of the amended CAA requires our attention. Since emissions cross state boundaries and can contribute to ozone formation, Congress included a provision that specifically addresses the phenomenon of windborn transport of pollutants. This section creates the Northeast Ozone Transport Region ("OTR") and Ozone Transport Commission ("OTC"), of which Delaware and eleven other states and the District of Columbia are a part.[7] Through this structure, states collectively may consider whether to recommend to the EPA (by majority vote) "additional control measures" for ozone beyond the measures required by other provisions of the CAA.[8]

If the OTC decides to recommend any additional control measures, the commission is required to "transmit such recommendations to the Administrator" of the EPA for the Administrator's further consideration.[9] This is significant because it demonstrates that the OTC lacks any power itself to impose additional control measures. Additional measures can only be imposed by the Administrator of the EPA after publication, public comment and a well-defined process of implementation.[10]

The amended CAA has resulted in a variety of regulatory activities. The activity at issue here arises from the fact that in September 1995 the OTC adopted a document entitled "Memorandum of Understanding ("MOU") Among the States of the Ozone Transport Commission on Development of a Regional Strategy Concerning the Control of Stationary Source Nitrogen Oxide Emissions."[11] The MOU contemplates that member states will undertake additional rulemaking at the state level to further reduce NOx emissions from major stationary sources.[12] The MOU did not commit any states to the adoption of a specific rule; in fact, it specifically contemplated that the states could consider alternative approaches that achieve "equivalent reductions ... in an equitable manner."[13] The MOU also contemplated the existence of a "regionwide"

2. 42 U.S.C. § 7409.

3. 40 C.F.R. § 50.9(a) (1997).

4. *See Virginia v. EPA,* D.C.Cir., 108 F.3d 1397, 1401 (1997).

5. 40 C.F.R. § 81.308 (1998).

6. Under 42 U.S.C. § 7407(d)(1)(A)(I), a state is divided into areas that are designated as "nonattainment" (areas that do not meet the NAAQS), "attainment" (areas that meet the NAAQS), or "unclassifiable" (cannot be classified as meeting or not meeting the NAAQS).

7. 42 U.S.C. § 7511c(a).

8. 42 U.S.C. § 7506a(b)(1).

9. 42 U.S.C. § 7511c(c)(1).

10. 42 U.S.C. § 7511c(c)(2).

11. Memorandum of Understanding, Ozone Transport Commission, (Sept. 27, 1994); *see* Def. Br.App. Ex. A.

12. *Id.*

13. *Id.* at B–4.

system for trading NOx emission allowances, an integral part of the plan contemplated by the MOU.[14]

After the signing of the MOU, representatives of the OTC, in consultation with industry representatives, developed the Budget Model Rule ("Model Rule").[15] The Model Rule was made available on May 1, 1996. It was not developed using rulemaking procedures, or on the basis of a public record, and it does not have any regulatory or other binding effect on Delaware or any other state in the OTR.

While it is clear that no state would be bound to adopt the model rule, the opportunity to implement a regional plan, particularly as it relates to the trading [buying and selling] of NOx emission allowances, depends on substantial similarity of the programs among the involved states.

On November 1, 1997, the Department published in the Delaware Register of Regulations a proposed rule, designated as Regulation No. 37,[16] which it described as intended to implement the 1994 OTR MOU. The Regulation closely followed the model rule. The Department relied on 7 *Del. C.* Chapter 60 as the basis of its rulemaking authority.[17] That statute provides:

> The Secretary [of DNREC] may adopt ... rules or regulations, or plans, after public hearing, to effectuate the policy and purposes of this chapter. No such rule or regulation shall extend, modify

or conflict with any law of this State or the reasonable implications thereof.[18]

The Delaware Code further requires that any regulations assure the "reasonable and beneficial use" [19] of the States's resources, and the "adequate supplies [of such resources] for domestic, industrial, power, agricultural, recreational and other beneficial uses." [20]

On appeal, the plaintiffs argue that the Department has failed to meet the requirements of the Delaware Administrative Procedures Act which requires the agency to provide: notice of its proposed action; [21] an opportunity for public comment; [22] "[a] brief summary of the evidence and information submitted;" [23] "[a] brief summary of its findings of fact with respect to the evidence and information;" [24] and "[a] decision ... supported by its findings on the evidence and information received." [25]

The Administrative Procedures Act also permits an agency to "designate a subordinate to organize, classify, summarize and make recommendations with respect to the materials." [26] In this instance, a hearing officer was designated. A public hearing was held on December 8, 1997 to receive comment. The record was left open for three days to receive additional comments. The Division of Air Quality Management ("AQM") prepared a Memorandum in response to the comments dated December 18, 1997.[27] The Hearing Officer's Report ("Report") was issued on December 22, 1997.[28] The Report, a copy of which is

---

14. *Id.* at B–3.

15. NOx Budget Model Rule (May 1, 1996); *see* Def. Br.App. Ex. B.

16. 1 Del. Reg. 564 (Nov. 1, 1997); *see* Pl. Br.App. Ex. A.

17. *Id.* at 1.

18. 7 *Del. C.* § 6010(a).

19. 7 *Del. C.* § 6001(b).

20. 7 *Del. C.* § 6001(a)(1).

21. 29 *Del. C.* § 10115(a).

22. 29 *Del. C.* § 10118(a).

23. 29 *Del. C.* § 10118(b)(1).

24. 29 *Del. C.* § 10118(b)(2).

25. 29 *Del. C.* § 10118(b)(3).

26. 29 *Del. C.* § 10116.

27. Memorandum, Air Quality Management, (Dec. 18, 1997); *see* Def. Br.App. Ex. C.

28. Hearing Officer's Report, DNREC, (Dec. 22, 1997); *see* Def. Br.App. Ex. D.

appended, essentially adopts all the responses of the AQM Memorandum: "While the above [discussion of approximately two pages, double spaced] represents only a small sample of AQM's responses out of a very thorough 27 page document, I have reviewed each comment, the relevant proposed regulatory provisions and the response document and have found AQM's positions to be based on credible evidence."[29] The Report goes on to note that AQM has provided a "legally defensible record in this matter... [which] may serve as a detailed Hearing Officer's Report [with one exception not pertinent here]."[30] The next procedural step for implementation was accomplished when Secretary Tulou entered an Order dated December 29, 1997 adopting Regulation No. 37 on the basis of the AQM's response incorporated by reference in the Hearing Officer's Report.[31]

On appeal the plaintiffs make three arguments:

1. That the Department has illegally delegated its rulemaking authority to a non-state entity—the OTC—and has otherwise denied the affected parties a meaningful opportunity to comment.

2. That the May 1, 1999 compliance date imposed by Regulation No. 37 lacks a reasonable basis in the record because:

—The record does not establish that control technologies required to meet the Regulation are available for the types of units covered by the Regulation or that those technologies can be designed, installed and tested by May 1, 1999.

—The record does not support the conclusion that a NOx allowance market for the OTC states will be functioning by May 1, 1999.

—The Department has concluded that a functioning interstate NOx allowance market is needed to make the rule achievable, yet the Department has established numerous restrictions on trading and banking that will hinder the development of a viable market for NOx allowances.

3. The Department has not established that it will effectuate the policy, purposes or requirements of 7 *Del. C.* Chapter 60.

Because the Hearing Officer's Report and the Secretary's Order basically adopt without analysis the Memorandum from AQM, any review of the fact-finding and decision-making function of the Secretary requires a review of the AQM Memorandum. With that in mind, I now turn to the first basis of challenge.

The plaintiffs argue that the record DNREC submitted supports the conclusion that there are significant risks and uncertainties inherent in the requirement that advanced post-combustion NOx controls be retrofit by the 1999 ozone season. Consequently, DNREC should not adopt the regulation as proposed. The AQM Memorandum states:

> While the Department agrees that each individual budget source may present some unique challenges to the application of post-combustion NOx control technology, it is the Department's opinion that post-combustion NOx control technology has matured and is commercially available from competent industry equipment manufacturers. This opinion is based on OTAG, EPA, and industry literature that indicates both SCR and SNCR are demonstrated technologies for utility sized boilers. *The inclusion of allowance trading for compliance purposes will permit market forces to help industry meet the overall reductions in a cost effective manner.*[32]

---

**29.** *Id.* at B–145—B–146.

**30.** *Id.* at B–146.

**31.** Secretary's Order No. 97–A–0044, DNREC, (Dec. 29, 1997); *see* Def. Br.App. Ex. E.

**32.** Memorandum, Air Quality Management; *see* Def. Br.App. Ex. C at B–78 (emphasis

 It was verified at oral argument that the record, for purposes of this appeal, is the material which has been provided in the appendices to the briefs—there is nothing more. The references listed on the last page of the AQM report are not in the record. Therefore, the record contains what appears to be substantial scientific evidence to support the industry's contentions that the regulations are too ambitious because the technologies are unproven, the deadlines are unrealistic, and there is no safety valve to provide protection against failure notwithstanding a good faith effort. The response by AQM is not supported by any documents or science, but merely a conclusory recitation of its opinion that technology has matured. In essence, the division relies upon OTAG [the EPA's Ozone Transport Assessment Group "Policy Run"], the EPA, and "industry literature." The underlying scientific documents are not provided in the record, nor is there any explanation as to why the counter-arguments of the industry are rejected. *The record lacks a reasonable basis for the Secretary's conclusion.*[33]

The italicized language quoted above raises another point. The industry submissions provide evidence to support the contention that the trading of allowances is not likely to be a viable way to protect industry if it is unable to meet the requirements of Regulation No. 37 in a timely manner. In response to the industry's argument, the AQM Memorandum states:

> The Department does not share this opinion [that the lack of an established allowance market will likely preclude compliance by May 1, 1999].
>
> \* \* \* \* \* \*

added).

33. 29 *Del. C.* § 10141(e); *see also Kreshtool,* 310 A.2d at 652.

34. Memorandum, Air Quality Management; *see* Def. Br.App. Ex. C at B–79.

While it is the Department's opinion that this view is speculative at best, the Department has also been given information from the OTC that speculates that a number of excess allowances are expected to be generated.[34]

The Division's "information" is not a part of the record. Even if it were, information based on speculation is hardly compelling. The record does contain data compiled by an industry consultant which indicates that there will be no significant amount of active trading of allowances in the foreseeable future. Again, the record lacks a reasonable basis for the Secretary's conclusion.[35]

The industry submissions request: the inclusion of a "safety valve" as a reasonable accommodation should the requirements of the regulation be unattainable in the time period available; an extension of the deadline from May 1, 1999 to a later date; and a change in the penalty for noncompliance or a change in the assumption that any exceedance is assumed to represent 153 days of violation. The agency's response to each suggestion is largely based on the fact that such a change would represent a deviation from the model rule.

 There is no doubt that DNREC has the power and authority to adopt regulations which best serve the interest of the public, consistent with the "reasonable and beneficial use" of the States's resources, and the "adequate supplies [of such resources] for the domestic, industrial, power, agricultural, recreational and other beneficial uses."[36] The Secretary has not explained in his decision how the implementation of Regulation No. 37, under the circumstances presented, furthers those public interests.

35. 29 *Del. C.* § 10141(e); *see also Kreshtool v. Delmarva Power & Light Co.,* Del.Super., 310 A.2d 649, 652 (1973) ("The record must clearly show the basis on which the administrative agency acted in order that its exercise of discretion may be properly reviewed.").

36. 7 *Del. C.* § 6001(a)(1), (b).

■ DNREC has failed to provide sufficient fact-finding and analysis of evidence to permit this Court to conclude that there is a reasonable basis on the record for its decision. That is not to say that the Department could not, on a fully developed record, reach the same conclusions. What is lacking here is a detailed, independent scientific examination. Reliance on a group within a committee within an agency without any independent review or analysis of the science is simply insufficient to withstand appellate scrutiny.[37]

The regulations are vacated and remanded for further action of the Department.

---

**37.** *See Olney v. Cooch,* Del.Supr., 425 A.2d 610, 613 (1981) ("Reversal is warranted if the administrative agency ... made findings of fact unsupportable by substantial evidence.").