**MOTIVA ENTERPRISES LLC,**
Appellant, Cross–Appellee,

v.

**SECRETARY OF DEPARTMENT OF NATURAL RESOURCES & ENVIRONMENTAL CONTROL, State of Delaware, Appellee, Cross–Appellant.**

**C.A. No. 98A–07–010–HLA.**

Superior Court of Delaware,
New Castle County.

Submitted: May 27, 1999.
Decided: Aug. 17, 1999.

**236**

R. Judson Scaggs, Jr., and Megan E. Ward, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, for Appellant/Cross–Appellee.

Kevin P. Maloney, Deputy Attorney General, Department of Justice, Wilmington, DE, for Appellee/Cross Appellant.

**OPINION**

ALFORD, Judge.

## I. INTRODUCTION

This case arises against the backdrop of an extensive regulatory scheme existing at both the federal and state levels designed to address air pollution. This controversy arose when, on December 24, 1997, the Secretary of the Department of Natural Resources and Environmental control ("DNREC" or "the Department") issued an Order which adopted a 1999 Rate–of–Progress Plan ("1999 ROPP") for Delaware under the federal Clean Air Act ("CAA" or "the Act.")[1] The Clean Air Act Amendments of 1990 require States with ground-level ozone attainment areas classified as severe or above to provide for, in addition to a 15% reduction in volatile organic compounds ("VOC") emissions by 1996, a VOC reduction or an equivalent nitrogen oxide reduction of 3%, averaged over each three-year period beginning November 1996.

At the heart of the controversy in this case is DNREC's 1999 ROPP declaring that an additional 3% reduction per year over the 1996 ROPP had been demonstrated, and the subsequent allegation by Motiva Enterprises ("Motiva") that the Department misappropriated reductions in air emissions that belong to Motiva.

## II. FACTS AND PROCEDURAL BACKGROUND

This Court has previously stated that the business of air quality regulation is quite complex.[2] An analysis of the various state and federal statutory schemes is required in view of the fact that the issue before the Court is one of first impression in Delaware.

The Clean Air Act establishes a program jointly administered by the federal government and the states designed to "protect and enhance the quality of the nation's air resources so as to promote the public health and welfare and productive capacity of its population."[3] It has been stated that one of the more difficult air pollution problems that the Act addresses is the persistent and high ambient levels of ozone in our nation.[4]

---

1. See 42 U.S.C. § 7401–7671q (1994).

2. See Delmarva Power & Light Co. v. Tulou, Del.Super., 729 A.2d 868 (1998).

3. See 42 U.S.C. § 7401(b)(1).

4. See F. William Brownell and Ross S. Antonson, *Implementing the New Eight–Hour NAAQS for Ozone—What Happened to the 1990 Clean Air Act?*, 11 Tul. Envtl. L.J., 355 (1998).

Ozone is the product of chemical and biological reactions in the atmosphere.[5] Ozone is not a direct pollutant-vehicles do not emit it, and it does not billow out of smokestacks.[6] It is instead formed from the mixture of two chemical precursors emitted by automobiles and certain industrial plants: Nitrogen oxides ($NO_x$) and a large group of hydrocarbon pollutants called Volatile Organic Compounds ("VOC").

The industrial sources of ozone pollutants include facilities that handle petroleum products, combustion sources, petroleum fuel-powered engines, as well as biogenic sources.[7] Ozone has been found to be harmful to human beings, essentially because of its effect on the respiratory system.[8] Its effect is even more harmful to persons with respiratory illnesses.[9] This is so because much of the ozone inhaled reacts with sensitive lung tissues, irritating and inflaming the lungs, and causing a host of short-term adverse health consequences including chest pains, shortness of breath, coughing, nausea, throat irritation, and increased susceptibility to respiratory infections.[10] However, the chronic effects from seasonal exposure to ozone have only been studied to a limited degree and most of the current evidence is derived from animal responses to chronic ozone exposure.[11]

Due to the vast interconnected variables that affect ozone production and transport, designing control mechanisms to address ozone problems has proven to be both difficult and costly.[12] To date, however, efforts to reduce ozone pollution have focused on the restrictions of VOC and Nitrogen emissions.[13] In order to achieve this goal, the CAA requires the federal Environmental Protection Agency ("the EPA") to establish primary and secondary National Ambient Air Quality Standards ("NAAQS") that represent the maximum acceptable concentration of air pollutants, such as ozone.

Once the EPA has established NAAQS, it is the responsibility of the states, with

5. *Id.* at 356.

6. For a discussion of ozone formation and pollution, *see Virginia v. EPA*, 108 F.3d 1397, 1399–1400 (D.C.Cir.1997); *State of New York v. EPA*, 133 F.3d 987 (7 th Cir.1998); *Commonwealth of Virginia v. EPA*, 74 F.3d 517 (4 th Cir.1996). *See also Office of Research & Development, EPA, Air Quality Criteria for Ozone and Related Photochemical Oxidants, EPA/600/P–93/004F*, (hereinafter "Office of Research & Development") at 1–2 to 1–4 (July 1996); *Committee on Troposphere Ozone Formation and Measurement, National Research Council, Rethinking the Ozone Problem in Urban and Regional Air Pollution* 33 (1991) (hereinafter "Rethinking the Ozone Problem").

7. *See Office of Research & Development, supra* note 6; *Rethinking the Ozone Problem, supra* note 6.

8. *See generally Final Rule*, 60 Fed.Reg. 4712 (1995).

9. *Id.*

10. *See Virginia v. EPA*, 108 F.3d at 1399–1400 (citing *Final Rule*, 60 Fed.Reg. 4712, 4712–13 (1995)).

11. *See Virginia v. EPA*, 108 F.3d at 1400. DNREC's "Air Quality Management" Webb page provides an excellent discussion of ozone pollution, which the Department refers to as "Public Enemy # 1." *See www.dnrec. state.de.us/air/aqm_page/aqm_nets.htm*, at ("Ozone Pollution": *www.dnrec.state.de.us /air/aqm_page/stopo3.htm* ). For example, the site informs the public that:

Of all the criteria pollutants that are monitored in Delaware, only ozone (3) occurs at levels that are classified as "unhealthy". Ozone is a colorless gas which is the main ingredient of smog. Ground level ozone is a severe public health concern. It damages lung tissue, aggravates respiratory conditions and makes people more susceptible to respiratory infections. Children are especially vulnerable to ozone's harmful effects [and that] Ozone levels often reach "unhealthy" concentrations in the summer months in Delaware, as well as in many other areas throughout the mid-Atlantic and northeastern United States. *Id.*

12. Brownell & Antonson, *supra* note 4, at 356.

13. *See generally Office of Research & Development, supra* note 6; *Rethinking the Ozone Problem, supra* note 6.

oversight by the EPA, to determine which areas are "nonattainment," i.e., do not meet NAAQS standards.[14] Pursuant to the CAA, each state must develop and submit to the EPA, "State Implementation Plans" ("SIP") that contain source-specific limitations and other requirements designed to ensure the attainment and maintenance of air quality consistent with NAAQS.[15]

The CAA requires nonattainment areas to continue "reasonable" progress toward attaining NAAQS.[16] This goal is achieved by requiring the nonattainment state to submit a revised SIP which would produce a fifteen percent (15%) reduction of the 1990 baseline VOC emissions that would occur no later than November 15, 1996.[17] This goal is referred to as the 1996 Rate–of–Progress Plan (hereinafter "1996 ROPP") indicating that the nonattainment state is required to demonstrate that it is making the required progress rate toward meeting the NAAQS for ozone.[18] Moreover, for every three year period after November 15, 1996, a state must submit a new rate of progress plan demonstrating an additional three percent (3%) reduction per year in VOC emissions until the state meets the air quality standard for ozone.[19]

The CAA mandates that NAAQS must be attained "as expeditiously as possible."[20] The Act provides that for primary standards, attainment is required not less than five years after an area is first determined to be nonattainment.[21] However, the CAA allows the EPA Administrator to extend the attainment date by another five years if it is determined that such an extension is appropriate, considering the severity of the nonattainment and the availability of means to control pollution.[22]

After a nonattainment determination for ozone, the CAA requires each area designated as such, to be "classified at the time of such designation" and "by operation of law" pursuant to one of five classifications.[23] The classifications are: (1) Marginal; (2) Moderate; (3) Serious; (4) Severe; and, (5) Extreme.[24]

In Delaware, VOC emission is regulated under the New Source Review ("NSR") program pursuant to Delaware Air Pollution Regulation 25 ("Regulation 25".)[25] The NSR imposes specific requirements and restrictions on VOC emissions from new sources and on increases in VOC emissions caused by modifications to existing sources. A source cannot obtain a construction permit to make a modification to its facility unless it meets the requirements of Regulation 25.[26]

14. *See* 42 U.S.C. § 7407.

15. *See* 42 U.S.C. § 7410. *See also* Lucinda Minton Langworthy, *EPA's New Air Quality Standards for Particulate Matter and Ozone: Boon for Health or Threat to the Clean Air Act?* 28 ENVTL. L. REP. 10502 (1998) (available on Westlaw). *See generally Treadway v. Missouri,* Mo.Supr., 988 S.W.2d 508, 509 (1999) (discussing briefly CAA standards for ozone pollution and non-attainment classifications.)

16. *See* 42 U.S.C. § 7511a(b)(1)(A)(I).

17. *See* 42 U.S.C. § 7511a(b)(1) & (d).

18. *See* 42 U.S.C. § 7511a(b)(1)(A).

19. *See* 42 U.S.C. § 7511a(c)(2)(A).

20. *See* 42 U.S.C. § 7502(a)(2).

21. *Id.*

22. *Id. See generally* Minton Langworthy, *supra* note 15 (discussing EPA Administrator's review and determination of the scientific adequacy of attainment and submission deadlines).

23. *See* 42 U.S.C. § 7511(a)(1).

24. *Id.*

25. Regulation 25 ("Requirements for Preconstruction Review") is available on DNREC's Webb site. *See www.dnrec.state.de.us/air/aqm _page/docs/pdf/reg_25.pdf.*

26. Regulation 25, § 1.7 provides:

No stationary source shall be constructed unless the applicant can substantiate to the Department that the source will comply with any applicable emission limit or New Source Performance Standard or Emission Standard for a Hazardous Air Pollutant as

Motiva[27] owns a wastewater treatment plant in New Castle County. The plant is located in a severe ozone nonattainment area.[28] Kent and New Castle Counties are classified as severe nonattainment areas, with an attainment date of November 2005.[29] As a result, any increase in VOC emissions from a modification to its facility must be offset with VOC emission reductions at a ratio of 1.3 tons per year ("tpy") of reductions to 1 tpy of new emissions.[30] The CAA in fact authorizes the creation and use of emission reductions to offset emission increases associated with plant modifications in areas not meeting NAAQS.[31] The availability of VOC emission reductions for use as offsets is therefore critical to companies such as Motiva where future plant modifications are likely to result in an increase in VOC emissions.

In 1990, the EPA promulgated the Benzene Waste Rule ("the BWR") as a national emissions standard for hazardous air pollutants pursuant to Section 112 of the CAA.[32] The BWR, which regulates emissions of benzene is found at 40 C.F.R. Part 61, subpart FF, and became effective on March 7, 1990. In 1991, Motiva met with DNREC officials to discuss Motiva's plan to achieve VOC reductions at its refinery's

wastewater treatment plant that would be in excess of those required by the BWR. Motiva, which had several compliance options under the BWR, chose a compliance strategy that would voluntarily reduce benzene and non-benzene VOC emissions.

Under the EPA's rulings, emission reductions must meet four conditions in order to be available for use as offsets. Reductions must be (1) surplus, or "voluntary"; (2) enforceable; (3) permanent; and (4) quantifiable.[33] A reduction is voluntary if it is not required by law. Emission reductions may be used both in a state's ROPP and by a source for offsetting purposes.[34] In Delaware, reductions can also be used to bank, sell or trade under Regulation 34, the State's Emission Banking and Trading Program.[35] Regulation 34 defines an Emission Reduction Credit ("ERC") as:

> [A]n actual emission reduction equal to one (1) whole [tpy] of a particular pollutant from an emission unit that has been certified by the *Department as enforceable, permanent, quantifiable, real,* and *surplus*, in accordance with this regulation ... [a]n *ERC* is a limited, contingent, nonvested authorization to emit a

set forth in the State of Delaware Regulations Governing the Control of Air Pollution. *See* www.dnrec.state.de.us/air/aqm_page/docs/pdf/reg_25.pdf.

27. Star Enterprises owned and operated the refinery until it was transferred to Motiva effective October 1, 1998. Motiva has acquired all of Star Enterprises' interest in the emission reductions at issue in this case. This Opinion will use "Motiva" to refer to either Star Enterprises or Motiva.

28. *See Delmarva Power & Light Co. v. Tulou,* Del.Super., 729 A.2d 868 (1998). *See also* Delaware Register of Regulations, Vol.1, Issue 6, 747 (Dec. 1, 1997) (hereinafter "DNREC's Proposed 1999 ROPP of Dec. 1, 1997"). DNREC's Webb page informs us that VOCs and nitrogen oxides in Delaware "are blown in from upwind areas such as Baltimore and Washington, DC." *See* www.dnrec. state.de.us/air/aqm_page/stopo3.htm.

29. *See* DNREC's Proposed 1999 ROPP of Dec. 1, 1997, *supra* note 28, at 747.

30. *See* 42 U.S.C. § 7511a(d)(2); *Del. Reg. No.* 25 § 2.3.

31. *See* 42 U.S.C. § 7503. § (c)(2) provides:

> Emission reductions otherwise required by this Act shall not be Creditable as emissions reductions for purposes of any such offset requirement. Incidental emission reductions which are not otherwise required by this Act shall be creditable as emission reductions for such purposes if such emission reductions meet the requirements of paragraph (1).

32. *See* 42 U.S.C. § 7412.

33. *See* 51 Fed.Reg. 43,831 (1992).

34. *See* 57 Fed.Reg. 13,509 (1992).

35. Regulation 34 is also available on DNREC's Webb site-line. *See* www.dnrec. state.de.us/air/aqm_page/docs/pdf/reg_34.pdf.

certain amount of air pollutants and does not constitute a property right.[36]

Between August, 1991 and November, 1993, Motiva submitted a series of four construction permit applications to the Department regarding modifications to its wastewater treatment plant ("WWTP") aimed at achieving compliance with the BWR and reducing non-benzene VOC emissions.[37] For example, on August 2, 1991, Motiva submitted an application for a construction permit to modify two equalization tanks and one spill diversion tank. Motiva informed DNREC that such modification would produce VOC reductions of 125.5 tpy and that it intended to use such reductions to offset the increased VOC emissions associated with its Ether Project.[38] Motiva claims that it proceeded to complete WWTP modifications after DNREC authorized Motiva on July 14, 1992, to use 75 tpy of reductions from the modification of the spill diversion tank to offset VOC increases from the Ether Project.

Motiva claims that the modifications produced large emission reductions.[39] Motiva also claims that after acknowledging Motiva's reductions as offsets for purposes of the Ether Project, DNREC adopted the position that some of the modifications were not voluntary, but were instead, mandatory under the new Section 28 of the Delaware Air Pollution Regulation 24 ("Regulation 24") adopted by DNREC in January, 1993.[40]

In January 1994, DNREC informed Motiva that DNREC may need to use Moti-

---

**36.** *Id.* at § 2 (emphasis in original). The record reflects that Motiva has not attempted to bank its emission reductions under Regulation 34. Motiva has only applied for emission credits under Regulation 25 for use as offsets.

**37.** The submissions were made by Star Enterprises, Motiva's predecessor in interest. The dates of the permit applications and the modifications it sought are:
  (1) August 2, 1991: Spill diversion and equalization tanks
  (2) Dec. 20, 1991: API/CPI separators
  (3) Sept. 1, 1992: Oily water sewer system
  (4) Nov. 9, 1993: Dissolved air flotation system

**38.** The company's Ether Project was the initial phase of projects designed to produce oxygenated gasoline to satisfy the requirements of § 211 of the CAA. *See Motiva's Pre Hearing Mem. before the Board,* Apr. 24, 1998, at 2, n. 3.

**39.** Motiva claims that the modifications produced the following reductions:

| Modification | VOC Reduction (tpy) |
|---|---|
| Equalization & Spill Diversion Tanks | 114.5 |
| API Separator | 559.4 |
| CPI Separator | 5.5 |
| DAF System | 93.5 |
| Minus increase from first stage aeration | -41.5 |
| Total | 731.4 |

*See* Motiva's Op. Br., at 9.

**40.** Regulation 24 ("Control of Volatile Organic Compound Emissions") is also available on DNREC's Webb site. *See www.dnrec.state.de. us/air/aqm_page/docs/pdf/reg_24.pdf.* Regulation 24, § 28 c.2 provides that the "owner or operator of any waste water (oil/water) separator at a petroleum refinery shall:

  i. Provide covers and seals on all separators and forebays
  ii. Equip all openings in covers, separators, and forebays with lids or seals and keep the lids or seals in the closed position at all times except when in actual use."

va's reductions in the State's 1996 ROPP. According to Motiva, DNREC neither informed Motiva that it held the view that Motiva's VOC reductions were mandatory, nor that DNREC might include other Motiva reductions in its 1996 ROPP. In February 1995, DNREC submitted the 1996 ROPP which appeared to include all of Motiva's VOC reductions. Motiva requested clarification on this issue and DNREC, again, informed Motiva that it was using all Motiva's VOC reductions in the report because all of Motiva's WWTP modifications were mandatory under Regulation 24.

On December 24, 1997, DNREC issued Order No. 97–A–0043 adopting the State's 1999 ROPP. On January 22, 1998, Motiva appealed DNREC's 1999 ROPP to the Environmental Appeals Board ("the Board") arguing that DNREC appropriated 730 typ of reductions in air emissions that should be credited to Motiva, and sought to reclaim its emission reductions for use as offsets against emission increases for future refinery projects.[41] The crux of Motiva's appeal was that DNREC took credit for all of Motiva's VOC reductions in order to attain the 3% yearly reduction goal. A hearing on this issue was held before the Board on May 12, 1998.

Motiva argued that it suffered substantial injury from the alleged misappropriation of its VOC reductions. It alleged that the injury was demonstrated in the construction of its RFG 2000 project. Motiva claims that it needed 10 tpy of VOC reductions in order to obtain permits for this project and as a result was forced to install an internal floating roof to obtain the necessary reductions at a cost of $200,000. Motiva states that if the VOC reductions had not been used in the 1999 ROPP, i.e.,

if the reductions had been available for use as offsets, Motiva would not have been required to install the internal floating roof.

The sole issue at the hearing was therefore whether or not Motiva's emission reductions were voluntary. DNREC's position with respect to the non-benzene VOC emission reductions was that they were mandatory under the BWR. The Department argued that the reductions being required by Regulation 24 were therefore unavailable for credits. Motiva argued instead, that Regulation 24 was inapplicable because Motiva began the project prior to the promulgation of Regulation 24.

On June 13, 1998, the Board issued its opinion.[42] The Board decided that some, but not all of Motiva's emission reductions were voluntary. It decided that a portion of the non-benzene VOC reductions were "voluntary and as incidental emissions they are entitled to be used as credits under the CAA § 173(c)(1) and (2)."[43] However, the Board disagreed with Motiva's contention that Regulation 24 was inapplicable and held that Motiva's reductions were mandatory.[44] The Board concluded that Motiva was only entitled to certain credits outside the scope of Regulation 24, specifically, only 8.5 tpy left over from the Ether Project.[45] The Board also determined that the question of whether DNREC was entitled to include Motiva's reductions in the 1999 ROPP thus making the reductions unavailable to Motiva for future offsets would be decided at a future date.

On July 13, 1998, Motiva filed an appeal with this Court to preserve its right to judicial review of the Board's first decision.

---

41. Motiva states that one such refinery project is the company's "RFG 2000" project.

42. It is unclear on what date the Board's Final Order and Decision was issued. The Court will use the June 13, 1998 date (the date of the last concurring Board member's signature) to refer to the Board's decision following the May 12, 1998 hearing. The

June 13, 1998 decision will at times be referred to as "the first Board decision."

43. *See* Bd. Decision of June 13, 1998, at 9.

44. *Id.*

45. *Id.* at 9–10.

The appeal was stayed by order of this Court pending resolution of all issues before the Board. A hearing on the remaining issue was held before the Board on September 22, 1998. The Board issued its final order and decision on November 20, 1998.[46] The Board determined that under 7 *Del. C.* § 6008, Motiva has standing to challenge *only* those reductions in which Motiva has a legally protected property interest. The Board found that Motiva had standing to challenge only 8.5 tpy. The Board also determined that DNREC treated Motiva's emission reductions in an arbitrary and capricious manner.

On December 23, 1998 Motiva appealed the Board's Final Order. On January 19, 1999, by order of this Court, the stay of proceedings on Motiva's first appeal was lifted and the appeals were consolidated. On January 22, 1998, Motiva filed an appeal to the Board seeking to have the Department's order declared unlawful. The Board bifurcated proceedings on Motiva's appeal.

On March 24, 1999 DNREC filed a Motion to Dismiss in this Court arguing that there had been no final agency decision subject to judicial review because the Board issued a remand to DNREC with instructions to revise the 1999 ROPP consistent with the Board's decision. DNREC argued that it was in the process of undertaking modifications to the ROPP consistent with the Board's decision. On April 15, 1999, this Court denied DNREC's motion finding that despite the Board's decision remanding to DNREC, the decision was in effect final and ripe for judicial review. This appeal followed.

### III. DISCUSSION

■ Under the Environmental control Act, "[a]ny person whose interest is substantially affected by any action of the Secretary may appeal to the Environmental Appeals Board . . ." [47] It is well-settled in Delaware that when reviewing a decision of an administrative Board, the Court must examine the record of the proceedings below and determine if there is substantial competent evidence to support the findings and conclusion of the Board.[48] Absent an abuse of discretion or an error of the law, the decision of the Board should be upheld if supported by substantial evidence.[49] Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.[50] The Court in its appellate review does not weigh the evidence, determine questions of credibility, or make its own factual findings.[51] The Court merely determines if the evidence is legally adequate to support the Board's factual findings.[52] This Court may affirm, reverse, or modify the Environmental Appeals Board's decision.[53]

The Court's analysis must begin with a discussion of the Board's June 13, 1998, and November 20, 1998 decisions. On December 24, 1997 Secretary Christophe A.G.

46. The Court will use the November 20, 1998 date to refer to the Board's decision following the September 22, 1998 hearing. The November 20, 1998 decision will at times be referred to as "the second Board decision."

47. *See 7 Del. C.* § 6008(a).

48. *See Johnson v. Chrysler*, Del.Supr., 213 A.2d 64, 66 (1965); *Tulou v. Raytheon Serv. Co.*, Del.Super., 659 A.2d 796 (1995); *Walton v. Bd. of Examiners of Psychologists*, Del.Super., C.A. No. 90A–JN–005, 1991 WL 35716, Barron, J. (Feb. 21, 1991).

49. *See Collazuol v. DNREC*, Del.Super., C.A. No. 93C–07–017, 95A–08–007, 1996 WL

658966, Lee, J. (Oct. 31, 1996) (Mem.Op.), at 4.

50. *See Oceanport Ind. v. Wilmington Stevedores*, Del.Supr., 636 A.2d 892, 899 (1994); *Battista v. Chrysler Corp.*, Del.Super., 517 A.2d 295, 297 (1986), *app. dism.*, Del.Supr., 515 A.2d 397 (1986).

51. *See Johnson v. Chrysler*, Del.Supr., 213 A.2d 64, 66 (1965).

52. *See 29 Del. C.* § 10142(d).

53. *See 7 Del. C.* § 6009(b).

Tulou issued Order No. 97A–A–0043, which adopted the 1999 Rate–of–Progress Plan proposed by DNREC and forwarded to the EPA as part of DNREC's State Implementation Plan revision. Motiva appealed the Order arguing that the VOC reductions used by DNREC in its report were voluntary and thereby available to Motiva as Earned Reduction Credits. DNREC's position was that the emission reductions were not voluntary but were instead, mandatory reductions under Regulation 24, and the BWR.

Following a hearing on Motiva's appeal, the Board, in its June 13, 1998 decision, determined that only those reductions resulting from modifications to the Spill Diversion and Equalization Tanks were voluntary and that all other reductions were mandatory under Regulation 24. The Board concluded that:

> Having decided [that] some of the modifications by [Motiva] to the WWTP were voluntary and that they should be entitled to apply for credits for incidental non-benzene VOC emission reductions which were beyond the scope of Regulation 24, the question remains whether DNREC was entitled to claim the reductions and the 8.5 tpy credits in the 1999 ROPP and thus make them unavailable to [Motiva.] [54]

After a second hearing to determine whether DNREC was entitled to include Motiva's 8.5 tpy credits in the 1999 ROPP, the Board determined that Motiva only had standing to challenge the use of 8.5 tpy of its VOC reductions and had suffered an "injury in fact" only with respect to the 8.5 tpy credits used in the 1999 ROPP. The Board found DNREC's use of Motiva's credits in its 1999 ROPP to be arbitrary and capricious.

In reaching its determination that Motiva had standing to challenge the use of only 8.5 tpy of its VOC reduction, the Board first found that Motiva did not have a legally protected interest in voluntary VOC emission reductions for which it had not applied for and received credits from DNREC. The Board stated that there were no published opinions granting a property interest in a reduction of VOC emissions from which it could draw guidance [55] and that in the absence of a state or federal statute or regulation clearly establishing a right to be granted credits for a reduction in VOC emissions, there is no mandate requiring DNREC to grant such a credit. [56]

The Board found that property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." [57] The Board held that after it reviewed Regulation 25, Section 7503(c) of the CAA, the Guidance on the Relationship Between the 15 percent Rate of Progress Plans of the CAA, and Sections 182(b)(1)(c) and 182(b)(1)(D) of the CAA, the states may, in their discretion, credit emission reductions towards the fifteen percent VOC emission reduction requirement. The Board concluded that Motiva has "not demonstrated that it has more than a unilateral expectation of [a right to be granted VOC emission reduction credits] or a legitimate claim of entitlement [to such credits]." [58]

Having decided that Motiva does not possess a legally protected interest in the VOC reductions, the Board turned to the standing issue to decide if Motiva was "substantially affected" under 7 *Del. C.* § 6008. The Board analyzed and relied on the Delaware Supreme Court's decision in *Oceanport Ind. Inc. v. Wilmington Steve-*

---

54.  *Id.* at 10.

55.  *See* Bd. Decision of Nov. 20, 1998, at 11.

56.  *Id.* at 13.

57.  *Id.* (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)).

58.  *Id.* at 13.

*dores, Inc.*[59] The Board also relied on two United States Supreme Court decisions, to wit, *Association of Data Processing Serv. Org., Inc. v. Camp* [60] and *Lujan v. Defenders of Wildlife.*[61] The Board determined that Motiva did not suffer an "injury in fact" under *Lujan,*[62] and, that Motiva has not "shown it had been 'substantially affected' by the use of the reduction in the 1999 ROPP and is subsequently without standing to bring this appeal under 7 *Del. C.* § 6008." [63]

The Board, however, disagreed with DNREC's reading of *Oceanport Indus. Inc.,*[64] that Motiva's "appeal is 'limited to its economic interest in maintaining the pollution status quo and resisting the [CAA's] mandate of pollution reduction' therefore failing the 'zone of interest' test and is without standing to take this appeal." [65] The Board found that DNREC's use of Motiva's credits in its 1999 ROPP,

> has affected [Motiva's] ability to complete the Reformulated Gasoline Project, has cost [Motiva] an economic loss, and falls within the zone of interest protected or regulated by 7 *Del. C.* 6001(a)(1) . . . [t]herefore, the Board has determined [that Motiva] is within the 'zone of interest', has been 'substantially affected' and has standing to bring this appeal regarding the credits granted by DNREC and used in the 1999 ROPP.[66]

The Board found DNREC's use of Motiva's voluntary VOC emission reductions to have been arbitrary and capricious, and remanded the matter to DNREC to complete the 1999 ROPP consistent with the Board's opinion. In so holding, the Board stated that the "1999 ROPP was developed under a tight deadline and DNREC used

the credits and voluntary VOC emission reductions of [Motiva] in an effort to keep the State from being sanctioned." [67]

Before this Court is Motiva's appeal from both Board decisions. Motiva makes four arguments. Motiva argues that (1) it has standing to challenge the Department's use of all Motiva's VOC reductions in the 1999 ROPP; (2) all of Motiva's reductions are voluntary because the current version of Regulation 24 does not render any of the reductions mandatory; (3) the Department's use of Motiva's voluntary reductions was illegal, arbitrary, and capricious; and, (4) the Department's actions constitute a compensable "taking" of Motiva's valuable property rights.

With respect to its first contention, i.e., that Motiva has standing to challenge the Department's use of the all of Motiva's VOC reductions in the 1999 ROPP, Motiva contends that the Board incorrectly applied the standing test as contemplated by 7 *Del. C.* § 6008(a). Motiva also contends that the Board's reading and application of *Oceanport Indus. Inc., Association of Data Processing,* and *Lujan* is incorrect.

As to its second contention, i.e., that all of Motiva's reductions are voluntary because the current version of Regulation 24 does not render any of them mandatory, Motiva argues that the doctrine of equitable estoppel prohibits a government agency from acting inconsistently with its previous actions when an entity has incurred substantial expenses in reliance on the agency's previous actions. Motiva claims that the Department was on notice of Motiva's intention to use the modifications to be able to use the reductions as offsets in the future, and that the Department never

---

59. Del.Supr., 636 A.2d 892 (1994).

60. 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

61. 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

62. *See* Bd. Decision of Nov. 20, 1998, at 13.

63. *Id.*

64. Del.Supr., 636 A.2d 892 (1994).

65. *Id.* at 14 (citing *Oceanport Indus. Inc.,* 636 A.2d 892 (1994)).

66. *Id.* at 15.

67. *See* Bd. Decision of Nov. 20, 1998, at 10.

informed Motiva that the incidental reductions were ineligible as offsets. Motiva argues that the Department acknowledged that Motiva's reductions were voluntary when it approved the use of some reductions as offsets for the Ether Project. Motiva also argues that the Board's retroactive application of Regulation 24 violates basic notions of fairness and is against public policy because such a finding will discourage sources from making voluntary reductions for fear that the Department will "confiscate" them with a new regulation.

Turning to its third argument, i.e., the Department's use of Motiva's voluntary reductions was illegal, arbitrary and capricious, Motiva posits that the CAA prohibits the Department from using Motiva's voluntary reductions in a ROPP. Motiva claims that under 42 U.S.C.A. § 7511a(b)(1)(C), a state may include emission reductions in a ROPP only if the reductions occur for the implementation of measures that are mandatory under either (1) a state regulation approved as part of the State Implementation Plan; (2) a federal regulation; or (3) a Title V permit. Motiva argues that its reductions do not meet any of the above criteria because: (1) The reductions were not required under state regulation and that the Department's insistence that Regulation 24 mandates the reductions is legally incorrect; (2) The BWR does not require the reductions undertaken by Motiva; and, (3) A Title V permit has not been issued for the refinery and therefore Motiva's reductions could not attributable to such a permit.

On this issue, Motiva argues further that even assuming that the Department had the authority under the CAA to use voluntary reductions in a ROPP, the 1999 ROPP must be vacated because the Department acted in an arbitrary and capricious manner with respect to all of Motiva's reductions. Finally, Motiva argues that the Department's actions constitute a compensable "taking" of Motiva's property rights in violation of the Fifth and Fourteenth Amendments to the United States Constitution.

DNREC has filed a response to Motiva's contentions, and is also cross-appealing the Board's decision. DNREC presents three arguments: (1) Motiva lacks legal standing to challenge the inclusion of the emission reductions in the 1999 ROPP; (2) DNREC was entitled to include the emission reduction in the 1999 ROPP; and, (3) the inclusion of the emission reductions in the 1999 ROPP did not amount to a Fifth Amendment taking.

With respect to its contention that Motiva lacks standing to challenge the inclusion of the emission reductions in the 1999 ROPP, DNREC argues that the Board's decision that Motiva does not have a legally protected interest in voluntary reductions not yet applied for and credited by DNREC is supported by substantial evidence. DNREC posits that Motiva's request is premature and speculative because "it attempts to end-run the procedure established by Regulation 25 ... for demonstrating eligibility to use the trading provisions (netting and offsetting) of Delaware law." [68] DNREC's standing argument therefore centers on the proposition that Motiva will be conferred standing only when DNREC makes a decision regarding any offset proposal submitted by Motiva.

Turning to its second argument, i.e., that it was lawful for DNREC to include the emission reductions in the 1999 ROPP, DNREC argues that all of the modifications undertaken by Motiva were mandatory under Regulation 24 with the exception of reductions associated with the Spill and Equalization Tanks. DNREC also argues that even if the emission reductions were surplus, DNREC may still use them in the 1999 ROPP because Motiva did not use those reductions for netting, offsetting, or banking.

68. *See* DNREC's Ans. Brief, at 14.

Finally, with respect to its third argument, DNREC avers that the inclusion of the emission reductions in the 1999 ROPP does not constitute a Fifth Amendment taking because Motiva's reductions cannot be considered to be a "property." DNREC relies on *Board of Regents v. Roth*[69] for the proposition that a compensable taking has not occurred unless a party can show that the thing allegedly taken constitutes property under the Fifth and Fourteenth Amendments. DNREC posits that a party cannot claim a property right unless the regulatory scheme has created a vested property right.

Further, DNREC argues that assuming, *arguendo*, Motiva does have a property interest in emission reductions, the 1999 ROPP is a legitimate exercise of governmental regulatory authority. DNREC contends that Congress has provided the states broad discretion to regulate air pollution emissions and that when the governmental interest involved is the protection of public health and welfare, the courts are less likely to find a taking.

■ With respect to the standing issue raised, Motiva argues that the Board incorrectly applied the standing test and committed legal error when it determined that Motiva had standing to challenge only those reductions in which Motiva has a "legally protected interest." The Court agrees. In Delaware, a plaintiff must have an interest distinguishable from the greater public in order to achieve standing.[70] It has been stated that an interest is suffi-

cient for the purposes of standing if "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question"[71] The Delaware Supreme Court has set forth a two part test to be utilized for establishing standing: (1) Whether there is a claim of injury-in-fact; and (2) Whether the interest sought to be protected is within the zone of interest to be protected by the statute.[72] This two-part requirement was derived from the United States Supreme Court's decision in *Data Processing.*[73] In adopting the *Data Processing* test, the Delaware Supreme Court noted that even though "[t]he refinement of the *Data Processing* test has had a long and varied history ... the United States Supreme Court has clearly enunciated the definitive statement on its application in *Lujan v. Defenders of Wildlife.*"[74]

As outlined by the Delaware Court in *Oceanport,* the *Lujan* Court folded the first two parts of the *Data Processing* test into one and held that two additional criteria must be considered: First, a party must have suffered an injury-in-fact, which is the invasion of a legally protected interest within the zone of interest sought to be protected or regulated by the statute.[75] The invasion must be (1) concrete and particularized, and (b) "actual or imminent, not conjectural or hypothetical."[76] Second, "there must be actual connection between the injury and the conduct complained of-the injury has to be fairly trace-

---

**69.** 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

**70.** *See Stuart Kingston, Inc. v. Robinson,* Del. Supr., 596 A.2d 1378 (1991). In *Stuart Kingston,* the Delaware Supreme Court noted that:

> The concept of "standing," in its procedural sense, refers to the right of a party to invoke the jurisdiction of a court to enforce a claim or redress a grievance. It is concerned only with the question of who is entitled to mount a legal challenge and not with the merits of the subject matter of the controversy. *Id.* at 1382.

**71.** *Oceanport,* 636 A.2d at 900 (quoting *Data Processing,* 397 U.S. at 153–154, 90 S.Ct. 827).

**72.** *See Gannett Co., Inc. v. State,* Del.Supr., 565 A.2d 895 (1989).

**73.** 397 U.S. 150, 153–154, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

**74.** *Oceanport,* 636 A.2d at 904 (citations omitted).

**75.** *Id.* at 904.

**76.** *Id.* (internal quotations omitted).

able to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." [77]   Finally, it must be likely that the injury will be redressed by a favorable decision, rather than merely speculative.[78]

A review of the Board's findings, the parties' submissions, as well the record leads this Court to conclude that Motiva has suffered an injury-in-fact under the *Oceanport* standard.  First, it is clear that "the interest sought to be protected" by Motiva "is arguably within the zone of interests to be protected or regulated by the statute." [79]   The Board correctly stated that the "emission reductions created by [Motiva] and regulated by DNREC are part of the 'air resources' addressed in 7 *Del. C.* § 6001(a)(1) ... [and] DNREC's use of [Motiva's] credits in the 1999 ROPP has affected [Motiva's] ability to complete the Reformulated Gasoline Project, has cost [Motiva] an economic loss, and falls within the zone of interest protected or regulated by 7 *Del. C.* § 6001(a)(1)." [80]

Second, Motiva's injury is clearly "concrete and particularized." [81]   Once DNREC used Motiva's reductions in the 1999 ROPP, Motiva was unable to use the reductions as offsets against emission increases in the future.  Moreover, its injury is "actual or imminent" and not "conjectural or hypothetical." [82]   Motiva has demonstrated that it was forced to spend $200,000 to obtain offsets needed for the RFG 2000 project.

In its November 20, 1998 decision the Board outlined the above *Oceanport* standing test correctly, however, it added an additional test.  It held:

Before the Board can decide if [Motiva] was "substantially affected" under 7 *Del. C.* § 6008, the Board must first determine if [Motiva] possessed a legally protected interest in the VOC reduction and if so, at what point they acquired this interest.  The Board considered whether or not there exists *a legally protected property interest* in a reduction of VOC emissions.[83]

Neither *Data Processing, Lujan,* nor *Oceanport* require a property interest in order to show standing.  After incorrectly determining that a property interest is a requirement for standing, the Board then went on to hold that:

[p]roperty interests do not emanate from the Constitution but 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claim of entitlements to those benefits." [84]

█  By requiring Motiva to show a property interest, the Board has clearly misstated the law.  The Board's determination that Motiva needs to show a legally protected property interest may stem from the Board's reading of the *Oceanport* standing test which requires a showing of a legally protected interest, and not, a legally protected property interest.[85]

With respect to the injury-in-fact prong of the *Data Processing–Lujan* standing test, the United States Court of Appeals for the Third Circuit recently determined that the loss of voluntary emission reduc-

---

77.  *Id.*

78.  *Id.*

79.  *Oceanport,* 636 A.2d at 900.

80.  *See* Bd. Decision of Nov. 20, 1998, at 15.

81.  *Id.*

82.  *Id.*

83.  *See* Bd. Decision of Nov. 20, 1998, at 11 (emphasis added).

84.  *Id.* (citing *Slawik v. State of Delaware & Pierre S. Dupont, IV.,* Del.Supr., 480 A.2d 636 (1984)).

85.  *Oceanport,* 636 A.2d at 904.

tion credits constitutes an injury-in-fact.[86] In *Duquesne Light Co. v. United States Envtl. Protection Agency*, an electric utility provider challenged the U.S. EPA's final rule approving, pursuant to the CAA, a revision to a New Source Review of the State Implementation Plan submitted by the Commonwealth of Pennsylvania.[87] The appeals court determined that although the company established the injury-in-fact prong of constitutional standing, the EPA's approval of the final rule was not traceable to the company's alleged injury, and that the company's injury was not redressable through judicial review.[88] As to the injury-in-fact prong of the *Lujan* test, however, the Court found:

> There is no serious question with respect to Dusquesne's injury-in-fact. Dusquesne has come to court complaining that it will lose ERCs as a result of the EPA approval of the PDEP's action. These ERCs are of tangible value to Dusquesne; they would permit Dusquesne to operate less expensively; and they are even fungible. Hence, Dusquesne has met the first requirement for standing inasmuch as the loss of valuable credits constitutes an imminent concrete injury.[89]

DNREC argues that *Duquesne* is inapplicable to this case because of the court's finding that the emission reductions at issue were "Emission Reduction Credits (ERCs.)" DNREC argues that ERCs are recognized pursuant to Regulation 34 in Delaware and that Motiva only seeks to establish that it owns the emission reductions for purposes of using them as offsets under Regulation 25. DNREC further argues that "[t]his distinction is critical to understanding the basis for the Board's conclusion that Motiva 'does not have a legally protected property interest in vol-

untary reductions not yet applied for and credited by DNREC' and thus lacked standing to challenge the inclusion of those reductions in the 1999 ROPP."[90] The Court finds DNREC's argument unpersuasive.

DNREC's argument misstates the holding and reasoning in *Duquesne* by equating ERCs to "offsets." The *Duquesne* court applied the term ERC broadly when referring to all emission reductions. It stated that "ERCs are recognized by the regulatory agencies as reductions in pollutants [and that] ERCs are determined as the difference between (1) emissions after an entity's action (e.g., shutting down or modernizing polluting equipment) . . . and (2) a baseline of prior 'actual emissions.'"[91] *Duquesne Light Co.* deals with the Commonwealth of Pennsylvania's New Source Review program and not with Delaware Regulations 34 and 25. DNREC's argument might be meritorious if, either the electric utility company in *Duquesne* had already created and banked the ERCs at issue, *or* if Motiva had, in the past, attempted to bank its emission reductions under Regulation 34. A review of the record does not show that Motiva has made an application to bank its reductions under Regulation 34. Rather, the record indicates that Motiva applied for emission credits under Regulation 25 for use as offsets in the future.

Turning to the second and third *Oceanport* standing tests, Motiva must show that there is an actual connection between the injury and the conduct it has complained of. The injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.[92] It

---

86. *See Duquesne Light Co. v. United States Envtl. Protection Agency*, 166 F.3d 609, 612 (1999).

87. *Id.* at 611.

88. *Id.* at 613.

89. *Id.* at 612–13.

90. *See* DNREC's Ans. Brief, at 14.

91. *Duquesne Light Co.*, 166 F.3d at 611.

92. *Oceanport*, 636 A.2d at 904.

must also be likely that the injury will be redressed by a favorable decision.

There is no serious question with respect to the causation requirement: DNREC's use of Motiva's reductions in the 1999 ROPP was injurious to Motiva. Motiva is prevented from using emission reductions as offsets. This injury was caused by DNREC's actions which were found to be "arbitrary and capricious" by the Board. The Court also finds the redressability requirement is satisfied in this case. A finding by the Board that Motiva is entitled to some or all of its emission reductions used by DNREC will redress Motiva's harm.

■■■■ DNREC does not seem to argue that the Board used an incorrect standard when determining whether Motiva suffered an injury-in-fact. Instead DNREC argues that "[w]hether Motiva had a legally protected interest in the remainder of the emission reductions ... was a fact driven determination involving the application of complex facts to a complicated network of environmental laws at the state and federal levels [and] [a]ccordingly, this Court should defer to the [Board's] findings."[93] The Court disagrees with DNREC's proposition, which in effect invites this Court to overlook the possibility that an administrative agency may have committed legal error whenever a complicated fact-driven issue is before it. The Court will not weigh the evidence presented before the Board nor will it attempt to resolve questions of credibility. While the Court recognizes the specialized competency of the Board and that of DNREC's, the Court is required to determine whether the Board's conclusions are supported by substantial evidence. The Court finds that the Board's application of the standard set forth by the Delaware Supreme Court in *Oceanport* was legally incorrect and therefore reverses the

Board's finding that Motiva may only challenge emission reductions in which it has a property interest. The Court finds that under Delaware law, Motiva has standing to challenge the use of all of its emission reductions.

■■■■ Moreover, having undertaken an extensive review of the record and the regulatory history in this case, the Court concludes that the Board's decision of June 13, 1998, finding that, "[a]t a minimum, it appears [Motiva] is entitled to 8.5 tpy in credits left over from the Ether Project and although the actual numbers are in dispute the testimony was that 111.5 tpy (+/the 8.5 tpy as it was unclear whether this figure included the 8.5 tpy) in reductions was available to [Motiva]"[94] only was not supported by substantial evidence.

■■■■ The Board's finding of fact and conclusion of law was largely based on a cursory review of Section 173 and the Guidance on Development of State Implementation Plans of the CAA. Although the Board's decision was supposedly based on statutory interpretation, the Board's analysis of Regulations 24 and 25, and the BWR was limited to the representations of the witnesses that appeared on behalf of the parties. A review of the intricate sections of Regulation 24, for example, leads this Court to conclude that it is unable to determine whether the Board made an independent review of the applicable sections in the regulation. Delaware courts have noted that "no adjudicative authority, administrative or judicial, may function without standards [and that] any review of such functioning can be effective only if the reviewing authority can identify what standard was applied and the factors to which the standards were applied."[95] The Court finds that the Board's decisions did not enunciate clearly the applicability or non-applicability of the various provisions of the BWR and Regulation 24 outside the

---

**93.** *See* DNREC's Ans. Br., at 12.

**94.** *See* Bd. Decision of June 13, 1998, at 10.

**95.** *See Hatzel & Buehler v. Martin*, Del.Super., C.A. NO. 80A–AP–11, Walsh, J. (Feb. 6, 1981) Let. Op., at 3.

contentions of the parties and the representations of the witnesses before the Board. Findings of an administrative agency "should be explanatory rather than conclusory."[96] Only when the Board's findings provide adequate legal standards can this Court engage in a proper review of the its decisions.

■ Turning to Motiva's equitable estoppel argument, Motiva argues that the Board erred by failing to recognize that DNREC was equitably estopped from denying that Motiva's reductions were voluntary. The doctrine of equitable estoppel has been recognized as valid in Delaware.[97] For the doctrine to apply, there must have been a "substantial change in circumstance based on a good faith reliance upon another's act ..."[98] In Delaware, equitable estoppel has been recognized within the zoning framework. It has been held that a government body exercising its zoning powers will be estopped when a property owner, (1) in relying in good faith, (2) upon some act or omission of the government, (3) has made such a substantial change in position or has incurred such extensive obligations and expenses, and (4) that it would be highly inequitable and unjust to destroy the rights which he has acquired.[99]

Despite the fact that Delaware courts have limited the application of the doctrine of equitable estoppel as it applies to governmental action to the zoning context, Motiva argues that the doctrine "involves concepts of fundamental fairness and consistency, which should apply to the Department's treatment of the regulated community."[100] Motiva's assertions, however, fail to recognize the fact that courts have applied the reasoning and rationale of traditional equitable estoppel against the government very narrowly.[101] Courts have also required that a party seeking to estop the government show some sort of "affirmative misconduct," an element normally not required to estop private parties.[102]

■ In this case, the record does not support Motiva's assertions that it relied entirely on DNREC's representations prior to making WWTP modifications. The record in fact reflects that Motiva anticipated that those changes would be mandatory in the future. Neither does the record show that DNREC engaged in affirmative misconduct. It should be clear, however, that this Court is not finding that Motiva's reductions were mandatory. The Court is merely stating that Motiva's equitable estoppel argument is without merit. The Board should consider, instead, whether DNREC's denial of Motiva's reductions as voluntary, as well as the usurpation of said reductions with knowledge that Motiva was seeking to use them as offsets presently or at a future date, was arbitrary and capricious.

■ The Court also disagrees with Motiva that this Court should issue an order

96. *Cf. Moses v. Delaware Dep't of Nutrition*, Del.Super., C.A. No. 80C–MY3, Bush, J. (Oct. 9, 1991) Let. Op., at 3.

97. *See Miller v. Bd. of Adjustment of Dewey Beach*, Del.Super., 521 A.2d 642 (1986); *Stokes v. Bd. of Adjustment of City of Dover*, Del.Super., 285 A.2d 813 (1971); *State v. Raley*, Del.Super., Cr. A. No. S90–07–0002, 1991 WL 18114, Babiarz, J. (Feb. 8, 1991), *aff'd*, Del.Super., 604 A.2d 418 (1991) (Order); *Dragon Run Farms, Inc. v. Bd. of Adjustment of New Castle County*, Del.Super., C.A. No. 88A–JA–2–1–AP, 1988 WL 90551, Stiftel, P.J. (Aug. 11, 1988) (Mem.Op.).

98. *Raley*, Cr. A. No. S90–07–0002, *supra*, at 8.

99. *Dragon Run Farms, Inc.*, C.A. No. 88A–JA–2–1–AP, *supra*, at 6–7.

100. *See* Motiva's Reply Br., at 8.

101. *See, e.g., Heckler v. Community Health Services*, 467 U.S. 51, 61–62, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984) (holding that the estoppel claimant had shown no possibility of detriment in spite of the fact that denying its claim might force it into bankruptcy).

102. *See, e.g., U.S. v. Marine Shale Processors*, 81 F.3d 1329 (5 th Cir.1996); *Fano v. O'Neill*, 806 F.2d 1262, 1265–66 (5 th Cir.1987); *Cadwalader v. United States*, 45 F.3d 297, 299 (9 th Cir.1995).

directing DNREC to vacate the 1999 ROPP. Whether the 1999 ROPP should be vacated or revised falls within the sound discretion of the Board. The issue before the Board on remand is whether all of Motiva's reductions were voluntary, and whether DNREC's use of some or all of Motiva's reductions was arbitrary and capricious. To the extent that the Board finds Motiva's reductions are voluntary, the Board should require DNREC to remove said voluntary reductions from the 1999 ROPP.

In conclusion, the Court **REVERSES** the Board's decisions of June 13, 1998, and November 20, 1998, and **REMANDS** this case to the Board for a determination of whether some or all of emission reductions complained of by Motiva were voluntary under the correct standing test and under specific sections of the BWR, as well as Regulations 24, and 25.

**IT IS SO ORDERED.**